PACIFIC TELEPHONE & TELEGRAPH CO. v. STARR.

(Circuit Court of Appeals, Ninth Circuit. July 7, 1913.)

No. 2,242.

1. MASTER AND SERVANT (§ 106*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—UNSAFE APPLIANCES.

Plaintiff, who with other employés of defendant telephone company was engaged in putting up wires on a building, fell and was injured by reason of the breaking of the round of a ladder on which he was standing, which was made of a piece of board sawed across the grain. Ladders for the use of the employés were supplied by defendant, but sometimes when those were insufficient the foreman directed the men to borrow

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

such as could be obtained nearby, and the one used by plaintiff had been so borrowed by another workman. *Held*, that in legal effect such ladder was furnished by defendant, which was responsible for its condition to the same extent as though it had been furnished from its own supply.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 193–198; Dec. Dig. § 106.*]

2. MASTER AND SERVANT (§ 208*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—DEFECTIVE APPLIANCES—ASSUMPTION OF RISK.

Ladders of unusual length, which employés of a telephone company are required to use in putting up wires on buildings, are not simple appliances, like mechanics' tools, for defects in which the employer cannot be held responsible, and the risk from which an employé assumes.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 551; Dec. Dig. § 208.*]

3. MASTER AND SERVANT (§ 288*)—ACTION FOR INJURY TO SERVANT—ASSUMPTION OF RISK—WHEN QUESTION FOR JURY.

Plaintiff, who was an employé of defendant telephone company, while standing on a long ladder furnished by defendant, engaged in putting up wires, fell and was injured by reason of a defect in the ladder. There was evidence tending to show that the defect was not obvious to a casual observer, but was discoverable by a careful inspection, which was not made. *Held*, that the question of plaintiff's assumption of the risk was one for the jury, and not for the court.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1068–1088; Dec. Dig. § 288.*

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

In Error to the District Court of the United States for the Northern Division of the Western District of Washington; Clinton W. Howard, Judge.

Action at law by Frank Starr against the Pacific Telephone & Telegraph Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Pillsbury, Madison & Sutro, of San Francisco, Cal., and Hughes, McMicken, Dovell & Ramsey, of Seattle, Wash., for plaintiff in error.

C. A. Reynolds, Harry Ballinger, and Charles T. Hutson, all of Seattle, Wash., for defendant in error.

Before GILBERT, Circuit Judge, and WOLVERTON and DIETRICH, District Judges.

WOLVERTON, District Judge. The defendant in error, who was plaintiff below, while engaged in cleating a cable through which were carried telephone wires to the side wall of a building in Seattle, Wash., fell from near the top of a ladder to the pavement below, a distance of from 20 to 25 feet, and was severely injured. Starr was in the employ of the Pacific Telephone & Telegraph Company at the time, to perform the service in which he was then engaged. The immediate cause of the accident was a defective round in the ladder, being the second from the top, which gave way. The round consisted of a board from 2½ to 3 inches in width by about three-quarters of an inch in thickness, which was sawed across the grain. With the weight of Starr upon it, it split out with the grain diagonally across the piece.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

For the injury thus sustained Starr sues to recover damages. The action is based upon the negligence of the company in furnishing the plaintiff with a defective and unsafe ladder upon which to perform his work, and in failing to properly inspect such ladder, or to exercise reasonable care and precaution in the selection of the same for plaintiff's use. For the particular work in hand a long extension ladder had been brought from the company's supply, and, finding that other ladders were needed, at the direction of George E. Smith, the foreman, two short ladders were picked up in the vicinity, one by Filer and another by McCartney, two men also working with plaintiff, there being six men working at the time. It being made known to Smith that another long ladder was needed, he directed the men to splice the two short ladders picked up by Filer and McCartney. This was done by Starr, the plaintiff, and McCartney, and no defect developed in the splicing. The ladders were spliced the day before the accident occurred.

The following is in effect a brief résumé of the testimony so far as deemed pertinent for application of the proper legal principles which control the case:

George E. Smith, who was foreman of the gang that was at work at the time for the defendant company, testified that a majority of the ladders was supplied by the telephone company; that as a general thing he got the ladders, that is, when they were telephone ladders; that it was not always possible to get a sufficient number of ladders from the telephone company, and in that emergency if he (Smith) was around he always told the men to borrow them—to get them. As respects the ladder in controversy, he further says that it consisted of two pieces; that he knew where the top piece came from—it was borrowed by Filer a couple of days before the accident; that Filer used the top piece for a while in putting up terminal boxes for connecting wires with the cable, these boxes being from 7 to 8 feet from the ground, and the ladder about 6 feet long; that the ladder was weather-beaten, the sides being dressed and the boards or cross-pieces rough, and the whole ladder was of fir. He further testified that cross-grained sticks are not usually used for rounds of ladders; that he was at the place of the accident substantially every day, and saw the ladders in use during the time before the accident; that he had a conversation with the men in the presence of Starr concerning the ladders; that they wanted a longer ladder to get up on the building with, and he told them to splice the two short ladders together and use them; that he did not observe any cross-grained round in the shorter ladder of the two, such condition not being apparent, and he did not think it would be apparent without a special inspection of the round; that he made no inspection of either of the ladders. On cross-examination he further testified that whenever the men were stringing a cable he was always right there.

Thomas McCartney testified that he was working with Starr at the time; that the extension ladder was furnished by the company; that it was the understanding that the company should furnish the ladder; that it did not always provide a sufficient number of ladders for the use

of the men, and when the company failed in that respect the men "used to have to rustle around the alleys and get them"; that this was done by the order of the foreman; that he thought Filer borrowed the short ladder, that being the topmost piece of the spliced ladder, and he (the witness) borrowed the longer piece; that the rounds were nailed to the side pieces of the ladder, not notched in; that he did not observe any cross-grained rounds in the ladder—they were not apparent to a person with ordinary use of the ladder—and that the use of a cross-grained piece would not be safe; that the men asked the foreman for some ladders to do the work; that the foreman replied that the men would have to rustle for them, and then, after the ladders were procured, he directed them to be spliced.

R. D. McMellon testified that George Smith was the foreman in charge at the time; that the company was supposed to furnish ladders, though it did not always furnish them; that when the job required a large number of ladders the foreman directed the men to borrow them, and this they did; he heard Smith tell two of the boys to splice the two ladders together; that the ladder in question was unpainted and roughly finished; that he examined the rung of the ladder at the time, and it was broken—that is, split "kind of crossways," and the larger piece was hanging down—that was after the accident; that the condition of the board before the accident would have been observable if one had made a close inspection of it. On cross-examination he testified:

"Q. Now, how close an inspection would it have required to see that this rung which broke was cross-grained? A. Well, I imagine it would have taken a careful examination of it before the accident. Q. How do you mean; how careful? A. Well, if a man got right down and probably examined the wood real carefully and close he could have noticed it. Q. Suppose Smith had examined it to determine whether it was cross-grained or not, what would he have had to have done; would he have had to scrape the timber? A. I think not. Q. He wouldn't had to have done that? A. No. Q. Would he have had to use a magnifying glass? A. I wouldn't judge he would have. Q. You mean to say Smith could have seen it with his naked eye, if he had just taken the ladder in his hand and looked at it? A. I think he could, yes; if he had looked at it closely. Q. How long would it have taken him to do that? A. I shouldn't judge it would have taken very long. Q. Could he have done it in an instant? A. No; I think not. Q. He wouldn't have had to cut into the grain, or anything of that kind? A. It wouldn't have taken him very long to examine the one rung. Q. He wouldn't have had to scrape the timber, or cut into it at all? A. I think not. I don't know. He might have."

Other witnesses—Werner and Dalton—testified along the same line. The plaintiff testified that he noticed Filer working on the ladder, and that he didn't examine it in particular. He was asked:

"Did such observation as you gave to the ladders, or either of them, disclose any danger about them? A. No, sir; I thought they was perfectly safe."

And in other respects he testified in like manner as the foregoing witnesses. He also said that Smith, the foreman, could not have told the rung was cross-grained by just glancing at it:

"If he had got right down close, and been looking for a cross-grain, he would have found it."

He was asked:

"Now, explain that; you think he could have told—you think Smith could have told—so as to have kept you off the ladder, if he had gotten down close to it, and looked at it closer? A. He could; yes. The same as one of those others were cross-grained, and he didn't know it."

The only witness called by the defendant was Filer, who testified in effect that he borrowed the short ladder, and that he considered it rather frail.

At the close of the testimony the defendant moved the court to direct a verdict in its favor, which was denied. Judgment was for plaintiff, and the telephone company prosecutes a writ of error.

[1] It is first contended by counsel for the company that the rule which imposes liability upon an employer who furnishes unsafe appliances has no application here, because the company did not furnish the appliance, but the same was selected by the plaintiff and his fellow servants.

We cannot agree with counsel in this statement as to who furnished the ladders. The strong tendency if not the great weight of the testimony is to the effect that the company was to furnish the ladders with which the men were to do their work in adjusting the cable. It was only when the company failed to furnish the requisite number of ladders from its supply that the men were required to get them elsewhere in the vicinity for their use; and this they did generally at the direction of the foreman. The very ladders which were conjoined were procured from the neighborhood by the direction of the foreman, and the splicing was done also at his direction; he designating what ladders should be joined. True, the company did not furnish these specific ladders out of its stock; but it did direct, through its foreman, how they should be procured, and, when procured, it directed their use and the specific manner in which they should be used. In such a case it is far from accurate to say that the company did not furnish the ladders. In legal effect just the contrary is true, for it did furnish them through the direction of the foreman how to obtain them. The situation is no different than if the foreman himself had gone out and got the ladders and turned them over to the men and directed them to use them. The act was the act of the company, for the men's employment and their engagement in the work contemplated that the company should furnish the ladders. The men did not engage to furnish any such tools, instrumentalities, or conveniences. This is a sufficient answer to the contention, without the citation of authorities; it being mainly one of fact. To say the least, the evidence was more than ample to carry the case to the jury upon the hypothesis that the company, and not the men, was to furnish the ladders, and upon the further proposition that the company did in fact furnish the ladders in use by the men, and upon which Starr was working at the time of his fall.

[2] Counsel next insist that a ladder is a simple appliance—that is, of a class with the ordinary carpenter's or mechanic's tools—and that accidents occasioned by the use of such simple appliances are not actionable. Many authorities are cited in support of this proposition,

but their application is not apparent, when the nature of the work in which these men were engaged and the kind of ladders required for their service are taken into account. The company was engaged in constructing a telephone system, or a part of it, throughout the city of Seattle, which required the stretching of wires, and cables carrying wires, by adjusting them upon poles and buildings where convenient at a considerable height from the ground. This required the use of ladders not of the ordinary kind, such as stepladders and short contrivances used about the house or by mechanics about their general work, but ladders of more than the ordinary length, and extension ladders calculated to reach high positions, which could be used with safety by men doing that character of work. These are the kind of appliances, and not the simple or ordinary kind, that the company was supposed to furnish for the use of the men engaged in the particular work in hand. And it was the attempt to supply a long ladder, one of unusual length, that led to the accident complained of. So it is not apparent that the doctrine sought to be invoked has application here.

[3] But let us consider the subject from another direction. The master is charged with the duty of observing reasonable care and precaution in furnishing to his employés reasonably safe tools and implements with which to do their work. The duty is not absolute to provide reasonably safe tools and implements, for he is not an insurer on that score, but to exercise reasonable care and forethought in providing such tools and implements as are reasonably suitable and safe for the work. When he has done this, he has discharged his bounden duty to his servants and employés. This duty imposes upon the master the responsibility of inspecting these instrumentalities to determine their safety, and here again he may be excused for a failure to discover defects, if he has been reasonably careful and diligent in making the inspection; but he is not to be excused in failure to make any inspection at all. If a tool or appliance is defective, and the defect is discoverable upon a careful scrutiny and examination, such as a reasonably prudent and careful man would make under like circumstances, the master would be at fault in furnishing such a tool or appliance to his workmen, and his failure to inspect could not help him. It would injure him, rather, as he would be guilty of a neglect of duty. If, however, the defect was latent in character, and not ordinarily discoverable by reasonable inspection, then he could not be held accountable. The duty to make the inspection, however, would remain, though, if the defect was of that character that a reasonable inspection would not disclose it, there could, of course, be no liability for failing to inspect.

The workman assumes those risks of danger which are ordinarily incident to the work in which he is engaged, and those which are open and obvious to the senses, and which are known to him, if he continues in the occupation. He assumes none that may arise from latent defects in appliances not apparent from casual observation, which appliances it is the duty of the master to furnish, and to exercise reasonable care with reference to their selection.

The common tools doctrine is but an adjunct of the doctrine of the

assumption of risk. If the tools are so simple that their mechanism, structure, and defects, if they have any, are as obvious to the workman as to the master, then and upon this account he assumes the risks attending the use of them. As is said in Vanderpool v. Partridge, 79 Neb. 165, 112 N. W. 318, 13 L. R. A. (N. S.) 668:

"The reason for the rule [the common tools rule] is that any defect in such simple tools or appliances would be as obvious to the servant as to the master."

But the rule can have no application where the appliance is of such character as that it cannot be classified as a simple tool or implement in mechanical use. In such a case the ordinary rule applies that the workman assumes such risks only as are open and obvious while pursuing his work, and he assumes no risks that are not apparent to the senses in that way. It is not incumbent upon him to make an inspection to determine the safety of implements and appliances furnished him in the course of his employment by the master. That is the duty of the master, not of the workman.

These principles are discussed and applied in the following cases of more or less analogy to the present: Ohio & Pittsburgh Milk Co. v. Fehl, 187 Fed. 792, 109 C. C. A. 640; Williams v. Garbutt Lumber Co., 132 Ga. 221, 64 S. E. 65; Jones v. Pacific Mills, 176 Mass. 354, 57 N. E. 663; Flood v. Western Union Tel. Co., 61 Hun, 619, 15 N. Y. Supp. 400; Twombly v. Consolidated Electric Light Co., 98 Me. 353, 57 Atl. 85, 64 L. R. A. 551.

The conclusion of the court in the latter case is peculiarly applicable here. It is as follows:

"And we think it was fairly open to the jury to find that the defective condition of the round might have been discovered had it been suitably inspected; not, perhaps, by such an inspection as would naturally be given to it by the workman upon it, whose duty it was to work, not to inspect, and who might lawfully rely upon the presumption that the master had performed its duty, but by such an inspection on the part of the master as reasonably would be necessary to make sure that an appliance upon which the servant was to risk his life or limb every time he used it was reasonably safe."

These considerations lead to the conclusion that the real question was one of assumption of risk on the part of Starr in the use of this ladder, and that the evidence adduced developed a cause proper to be submitted to the jury, and not one for the court to determine as matter of law.

Likewise the question whether the plaintiff was guilty of contributory negligence under the evidence was one for the jury, and not for the court.

Lastly, it is insisted that plaintiff failed to prove his cause of action. What has been said already is sufficient to indicate that the proofs offered were quite sufficient upon which to submit the cause to the jury.

Affirmed.